## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOANN E. CAPPEL,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:05-0544** |
| v. | : | **(MCCLURE, D.J.)** |
| | | **(MANNION, M.J.)** |
| **JO ANNE B. BARNHART,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant** | : | |
| | : | |

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §405(g) to determine whether there is substantial evidence to support the Commissioner's decision terminating the plaintiff's Social Security Disability Insurance Benefits, ("D.I.B."), under Title II of the Social Security Act, ("Act"), based upon the fact that the plaintiff's disability had ceased as of April 2003 because of medical improvement related to her ability to work.  42 U.S.C. §§ 401-433.  Based upon the court's review of the record in the instant action, it is recommended that the plaintiff's appeal of the decision of the Commissioner be denied.

## I. Procedural Background

The plaintiff protectively filed an application for D.I.B. on October 21,

1

1999[1], in which she alleged disability since October 12, 1999, due to emotional problems. (TR. 11, 54, 127-30). On August 25, 2000, an Administrative Law Judge, ("A.L.J."), granted the plaintiff's D.I.B. claim finding that her impairments met the requirements of §12.04 (Affective Disorders) of the Listing of Impairments. (TR. 11, 50-65).

Subsequently, a continuing disability review was conducted. (TR. 137-38). By notice dated April 1, 2003, the plaintiff was informed that her condition had improved and that she was able to start working as of April 2003. (TR. 69, 84-86).

The plaintiff filed a request for reconsideration, (TR. 87-88), after which a disability hearing officer affirmed the finding that the plaintiff's disability had ceased as of April 2003. (TR. 94-102).

The plaintiff sought review by an A.L.J., who held a hearing on December 11, 2003. (TR. 22-47). The plaintiff was represented at her hearing before the A.L.J. In addition to the plaintiff's testimony, the A.L.J. heard the testimony of Anthony Galdieri, a medical expert, and Francene Tearpock-Martini, a vocational expert. (TR. 22).

On January 13, 2004, the A.L.J. issued a decision in which he found that the plaintiff had been found to be disabled within the meaning of the Act as of October 12, 1999; the plaintiff was found disabled because she had

---

[1]The plaintiff had also applied for Supplemental Security Income, ("S.S.I."), benefits. However, the S.S.I. claim was denied due to excess income. (TR. 11). Therefore, only the D.I.B. claim is at issue in this case.

impairments severe enough to equal the requirements of §12.04 of the Listing of Impairments; the plaintiff had not engaged in substantial gainful activity subsequent to the onset date of disability; as of April 2003, the plaintiff did not have an impairment, or combination of impairments, severe enough to meet or equal the criteria for establishing disability under any applicable listed impairment set forth in Appendix 1, Subpart P, Social Security Administration Regulations No. 4; as of April 2003, there was medical improvement in the plaintiff's condition related to her ability to work; no exception to the medical improvement standards set forth in the Act applies to the plaintiff's case; the medical evidence of record establishes that the plaintiff's depression is severe; the plaintiff has no exertional limitations; since April 2003, the plaintiff has the residual functional capacity to perform simple, unskilled work requiring one-to-three steps and minimal concentration; the plaintiff is unable to return to any of her past relevant work; at the time of her hearing, the plaintiff was a forty-one (41) year old younger individual with a high school education and past relevant work which was semi-skilled in nature; transferability of skills was not an issue in the plaintiff's case; there are other jobs which exist in significant numbers in the national economy which the plaintiff is functionally capable of performing in combination with her age, education, and work experience; the plaintiff's entitlement to a period of disability ceased in April 2003, with benefits terminating in June 2003; and the plaintiff has not been under a "disability" as defined in the Act at any time since April 2003.  (TR. 8-

17).

Following the plaintiff's request for review of the A.L.J.'s decision, (TR. 7), the Appeals Council concluded that there was no basis upon which to assume jurisdiction of the plaintiff's action. (TR. 4-6). Thus, the A.L.J.'s decision stands as the final decision of the Commissioner.

Currently pending before the court is the plaintiff's appeal of the decision of the Commissioner of Social Security filed on March 17, 2005. (Doc. No. 1).

**II. Continuing Disability Determination Process**

An eight step sequential evaluation process is required to determine whether a claimant has a continuing disability. 20 C.F.R. §404.1594. This process requires the A.L.J. to consider: (1) Is the claimant engaging in substantial gainful activity? (2) If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1? (3) If the claimant does not meet or equal a listed impairment, has there been a medical improvement as defined in 20 C.F.R. §404.1594(b)(1)? (4) If so, is the medical improvement related to the ability to work? (5) Do any exceptions to the medical improvement standard apply? (6) If medical improvement is related to the ability to work, or if any of the exceptions to medical improvement apply, does the claimant have a severe impairment or combination of impairments?

(7) Can the claimant return to her past relevant work? (8) Can the claimant do any other work?

## III. Evidence of Record

The plaintiff was born on January 19, 1962, and was forty-one (41) years old at the time of the A.L.J.'s decision. (TR. 17, 48). She has a high school education, and past relevant work experience as a certified nurse's aide, assembler, and security guard. (TR. 13, 41-43).

The relevant medical evidence of record establishes that on October 12, 1999, the plaintiff was involuntarily admitted to the Pottsville Hospital and Warne Clinic. (TR. 210, 215). At that time, the plaintiff expressed depression with homicidal ideation and no particular target. (TR. 214). The plaintiff was diagnosed with major depressive disorder and was assessed a Global Assessment of Functioning, ("G.A.F."), score of 10-20[2]. (TR. 210). During her hospitalization, an Employability Assessment Form was completed for the

---

[2] A G.A.F. score represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R) 34 (4th ed. 2000).  The G.A.F. score is taken from the G.A.F. scale which is "to be rated with respect only to psychological, social and occupational functioning." Id.  The G.A.F. scale ranges from 100 ("superior functioning") to 1 ("[p]ersistent danger of severely hurting self or others . . . or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death.") Id.
 A G.A.F. score of 11-20 indicates that the individual has "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent, manic excitement) or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . ." Id.

5

Pennsylvania Department of Public Welfare, on which it was indicated that the plaintiff would be temporarily disabled from October 12, 1999, through October 12, 2000, due to major depressive disorder. (TR. 208). The plaintiff was discharged on October 18, 1999. (TR. 210).

On October 20, 1999, the plaintiff began outpatient therapy at the Schuylkill County MH/MR Program. Upon evaluation, the plaintiff was noted to have fair insight and judgment, obsessive ideation, depressed mood and flat affect. (TR. 231). The plaintiff was also noted to have an impulse control disorder. (TR. 232). The plaintiff's G.A.F. was rated at 45[3]. (Id.).

On October 27, 1999, the plaintiff was evaluated by Stefan P. Kruszewski, M.D. Upon evaluation, Dr. Kruszewski noted that the plaintiff's mood was mildly dysphoric. Past, but no current, suicidal ideation was noted. The plaintiff was noted to have a history of insomnia, persecutory thoughts and thoughts of jealousy. (TR. 237). Dr. Kruszewski diagnosed the plaintiff as follows: r/o major depression, in remission (based upon history and clinical presentation); depressive disorder, nos; adjustment disorder with mixed emotional features; r/o delusional disorder, persecutory or jealous subtype; psychoactive substance abuse dependency, nos, in remission; r/o borderline

---

[3]A G.A.F. score between 41-50 denotes "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R) 34 (4th ed. 2000).

IQ; r/o personality disorder, nos; and a G.A.F. of 35-44[4].  (TR. 238).

On December 27, 1999, Uchenna C. Uzoukwu, M.D., diagnosed the plaintiff with major depressive disorder by history; current G.A.F. 50 to 55[5]. (TR. 274-75).

On January 6, 2000, a Psychiatric Review Technique form was completed by Jonathan Rightmyer, Ph.D., a state agency physician, who opined that the plaintiff had affective disorders, but that her disorders did not meet or equal any of the listed impairments.  (TR. 254-62).  Dr. Rightmyer also completed a mental residual functional capacity assessment, on which he found that the plaintiff had either no significant or moderate limitations in her ability to understand and remember, sustain concentration and persistence, interact in social settings and adapt to situations.  (TR. 263-65). Dr. Rightmyer indicated that the plaintiff's major depression had been stabilized with treatment.  (TR. 265).

On January 28, 2000, Dr. Uzoukwu increased the plaintiff's medications

---

[4]A G.A.F. score between 31 and 40 indicates "some impairments in reality, testing or communications (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R) 34 (4th ed. 2000).

[5]A G.A.F. score between 51 and 60 indicates that the individual experiences moderate symptoms or has moderate difficulty in social, occupational, or school functioning.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R) 34 (4th ed. 2000).

due to her complaints of increased anxiety and withdrawal and isolation with lack of motivation.  (TR. 273).

On March 15, 2000, Dr. Uzoukwu diagnosed the plaintiff with major depressive disorder, by history; rule out post-traumatic stress disorder, chronic; and assessed the plaintiff a G.A.F. score of 50 at the time of her evaluation and a G.A.F. score of 45 for the past year.  (TR. 270-72).  Dr. Uzoukwu recommended that the plaintiff be tested to determine her IQ.  (Id.).

On May 3, 2000, the plaintiff complained that her medications were not working properly.  (TR. 276).  Upon evaluation, the plaintiff's thought process was noted to be concrete.  (Id.).  The plaintiff denied disturbance of sleep or appetite.  No hopelessness or helplessness and no suicidal or homicidal ideation was noted.  (Id.).

On August 23, 2000, a Psychiatric Review Technique form was completed by A.A. Gold, Ph.D., a state agency physician, who found that the plaintiff had an affective disorder which met or equaled Listing §12.04.  (TR. 277, 280).

On February 13, 2002, the plaintiff treated with Dr. Uzoukwu.  Upon evaluation, the plaintiff was noted to be pleasant and cooperative.  Her affect was congruent to mood, and no suicidal or homicidal ideation was noted. The plaintiff had no thought disturbance.  The plaintiff denied depressive symptoms, or disturbance of sleep, appetite, thought or perception.  At that time, the plaintiff indicated that she was doing well on her medication.  (TR.

290).

On May 8, 2002, Dr. Uzoukwu noted that the plaintiff's affect was congruent to mood and that there was no thought or perceptual disturbance. The plaintiff denied any disturbance of sleep or appetite, but requested an increase in her medication to help "diminish the noises behind her head." (TR. 289).

On August 7, 2002, Dr. Uzoukwu noted that the plaintiff was no longer experiencing noises behind her head. The plaintiff's affect was congruent to mood, and the plaintiff denied any auditory or visual hallucinations, or suicidal or homicidal ideation. Dr. Uzoukwu continued the plaintiff on her medication and recommended that she be seen for outpatient treatment. (TR. 288).

On November 6, 2002, the plaintiff reported a "big change" on her medication regime and indicated that she was no longer thinking irrationally. The plaintiff's speech was noted to be more spontaneous, logical and goal directed. The plaintiff was noted to have good concentration and attention span and denied any suicidal or homicidal ideation. (TR. 287).

On February 12, 2003, the plaintiff reported having brief episodes of depression when under stress. She indicated, however, that she was no longer experiencing paranoia or auditory hallucinations and indicated that she was thinking clearer. The plaintiff denied any disturbance of sleep or appetite. Dr. Uzoukwu recommended that the plaintiff continue her medication regime and outpatient therapy. (TR. 286).

On March 19, 2003, a Psychiatric Review Technique form was completed by Richard Williams, Ph.D., a state agency physician, who found that the plaintiff had an affective disorder which was not severe.  Dr. Williams found that the plaintiff had no restrictions of activities of daily living; mild difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence or pace; and no repeated episodes of decompensation.  (TR. 291-304).

On May 16, 2003, the plaintiff reported periods of depression with intermittent auditory hallucinations and paranoia.  The plaintiff denied any suicidal or homicidal ideation, or disturbance of sleep or appetite.  (TR. 320).

On May 27, 2003, a Psychiatric Review Technique form was completed by Salvatore Cullari, Ph.D., a state agency physician, who found that the plaintiff had an affective order that was not severe.  Dr. Cullari indicated that the plaintiff had mild restrictions of activities of daily living; mild difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence or pace; and no repeated episodes or decompensation.  (TR. 316).

On July 24, 2003, the plaintiff treated with Saverio Laudadio, D.O.  At that time, she indicated that she was non-compliant with her medication regime, specifically Prozac, because it made her sleepy. Upon evaluation, Dr. Laudadio noted that the plaintiff was alert and oriented and that there was no evidence of hallucination, delusions or illusions.  The plaintiff's speech was

reduced, but relevant and coherent.  Dr. Laudadio noted that the plaintiff's affect was blunted; her mood depressed; and her insight and judgment were poor.  Dr. Laudadio started the plaintiff on different medication and recommended continuing counseling.  (TR. 321).

On September 9, 2003, the plaintiff reported being compliant with her medication and denied having any adverse side effects from her medication.  Upon examination, Dr. Laudadio noted that the plaintiff was alert, cooperative and oriented in all spheres.  The plaintiff exhibited no evidence of hallucinations, delusions or illusions.  The plaintiff's speech was reduced, but relevant and coherent.  Dr. Laudadio noted that the plaintiff's psychomotor activity was within physiological limits and that her insight and judgment were fair.  (TR. 321-22).

On November 4, 2003, Dr. Laudadio noted that the plaintiff was alert and oriented, and that she exhibited no evidence of hallucinations, delusions or illusions.  The plaintiff's speech was again reduced, but relevant and coherent.  Although the plaintiff's insight and judgment were noted to be poor, she denied any suicidal or homicidal ideation.  (TR. 321-23).

At her hearing before the A.L.J., the plaintiff testified that she usually gets up around 2:00 p.m., gets something to eat, and then lays down and watches television.  The plaintiff testified that she makes her own meals and sometimes cooks for her eighteen (18) year old daughter with whom she lives.  The plaintiff testified that she is able to perform household chores, and that

she walks approximately one-half (½) of a mile to go grocery shopping. The plaintiff testified that she can drive and has a driver's license, but does not have a car. According to the plaintiff, she has to take a two (2) hour nap every afternoon and then goes to bed at 11:00 p.m. because she gets tired. The plaintiff testified that she has not been hospitalized since 2000. (TR. 30-54).

Upon examination, Dr. Galdieri[6] testified that the plaintiff had experienced medical improvement subsequent to April 2003. (TR. 27). According to Dr. Galdieri, the plaintiff's impairments result in mild limitations in activities of daily living and social functioning; moderate limitations in concentration, persistence and pace; and one or two repeated episodes of decompensation. Despite the fact that Dr. Galdieri noted that the plaintiff experienced some intermittent symptoms, he indicated that there was nothing in the record to indicate that the plaintiff's impairments were severe, in that they were being adequately managed with medication. (Id.).

Upon examination, the vocational expert was asked to assume a hypothetical individual who would be limited to simple, unskilled work of one to three steps, requiring only minimal concentration. (TR. 43). In response, the vocational expert testified that the individual could perform jobs such as a janitor/cleaner, machine feeder/tender, hand packager, laborer (except construction), and assembler (unskilled as compared to the plaintiff's past

---

[6] Dr. Galdieri had also testified at the plaintiff's August 2000 hearing. At that time, Dr. Galdieri testified that the plaintiff's impairments equaled the requirements of Listing §12.04. (TR. 11, 26-27, 54, 79-81).

12

relevant semi-skilled assembler work).  The vocational expert testified that these positions existed in significant numbers in the economy.  (TR. 45).

## IV. Discussion

In this appeal, the only issue raised is whether the hypothetical given to the vocational expert reflected all of the plaintiff's impairments as supported by the record.  Specifically, the plaintiff argues that the hypothetical given to the vocational expert did not mention her moderate difficulties in maintaining persistence and pace and her episodes of de-compensation as testified to by Dr. Galdieri and accepted by the A.L.J. (Doc. No. 11, pp. 11-13).

Upon review of the hypothetical posed to the vocational expert, although the A.L.J. only specifically referenced a requirement for "minimal concentration," the limitations posed by Dr. Galdieri and accepted by the A.L.J. with respect to persistence and pace were accommodated in the A.L.J.'s hypothetical which also limited the plaintiff to "simple, unskilled work of one to three steps."  Moreover, to the extent that the A.L.J. failed to include any factor for episodes of decompensation in his hypothetical, although Dr. Galdieri testified that the plaintiff may have had one or two episodes of decompensation based upon her subjective complaints, he further testified that, despite this, there was nothing in the record to indicate that the plaintiff's impairments were of such severity as to preclude her from any work activity based upon the fact that they were being managed with medication. (TR. 27).

13

Where a vocational expert's testimony is in response to a hypothetical that fairly sets forth every credible limitation established by the evidence of record, that testimony can be relied upon as substantial evidence supporting the A.L.J.'s conclusion that the plaintiff is not totally disabled. Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999); Chrupcala v. Heckler, 829 F.2d 1269 (3d Cir. 1987); Rotshteyn v. Massanari, 2001 WL 912418 (E.D.Pa.).

Here, the A.L.J.'s hypothetical adequately set forth the plaintiff's limitations as supported by the record. As such, the testimony by the vocational expert in response to the hypothetical may be relied upon as substantial evidence in support of the A.L.J.'s decision.

**V. Conclusion**

On the basis of the foregoing, **IT IS RECOMMENDED THAT:**

the plaintiff's appeal of the decision of the Commissioner, **(Doc. No. 1)**, be **DENIED**.

S/ Malachy E. Mannion
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Dated:** February 23, 2006
O:\shared\REPORTS\2005 Reports\05-0544.01.wpd